# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

**UNITED STATES OF AMERICA,**

  **Plaintiff,**

    **v.**

**MARIO LEBRÓN-CACERES,**

  **Defendant.**

**CRIMINAL NO. 15-279 (PAD)**

## OPINION AND ORDER

Delgado-Hernández, District Judge.

  Mario Lebrón-Caceres was indicted for coercion and enticement of an individual to engage in a sexual activity, and with interstate extortion as proscribed by 18 U.S.C. § 2422(a) and § 875(d) (Docket No. 10).  Before the court is Lebrón's "Motion to Dismiss Count One of the Indictment" (Docket No. 24), which the government opposed (Docket No. 29).

  The motion to dismiss is predicated on the view that Puerto Rico is not a territory of the United States.  A thorough purview of relevant materials shows that Puerto Rico is such a territory. See, Maysonet-Robles v. Cabrero, 323 F.3d 43, 53 (1st Cir. 2003)(describing Puerto Rico as an unincorporated territory of the United States); Dávila-Pérez v. Lockheed Martin Corporation, 202 F.3d 464, 468-469 (1st Cir. 2000)(noting that Puerto Rico is a territory subject to Congressional power under the Territorial Clause); United States v. Rivera-Torres, 826 F.2d 151, 154 (1st Cir. 1987)("…Congress can, pursuant to the plenary powers conferred by the Territorial Clause, legislate as to Puerto Rico in a manner different from the rest of the United States")(citing Harris v. Rosario, 446 U.S. 651 (1980)(other internal citations omitted)).  On that basis, defendant's motion is DENIED.

To facilitate review, this Opinion has been organized under the following topics:

I.      INTRODUCTION…………………………………………….........   2

II.     DISCUSSION……………………………………………….......   3

        A.    Statutory Background ……………………………………   3

        B.    Territoriality ……………………………………………… 10

        C.    Puerto Rico's Relationship with the United States …………14

        D.    Significance of Historical Developments  ………………… 18

        E.    Congressional Intent ……………………………………… 26

        F.    Judicial Perspectives ……………………………………… 29

        G.    United Nations …………………………………………… 32

        H.    Present Statute …………………………………………….. 34

III.    CONCLUSION  …………………………………………….... 36

## I.      **INTRODUCTION**

According to the criminal complaint giving way to the Indictment, HSI-ICE agents received information that Lebrón possessed sexually explicit images of a female victim and was threatening to upload them to the internet unless she agreed to engage in sexual intercourse with him (Docket No. 1 at ¶¶ 3-4, 7).  After filing a complaint with the local authorities, who in turn, consulted with HSI-ICE agents, the victim conducted a consensually monitored telephone call with Lebrón, during which the former suggested they meet in a motel in Caguas, Puerto Rico, to have sex in exchange for Lebrón's deleting the sexually-explicit images.  Id. at ¶¶ 9-10.  Later, under the supervision of HSI-ICE agents, the victim agreed to meet Lebrón in a fast-food restaurant and go together to a motel.  After Lebrón arrived at the restaurant, he was detained and subsequently charged.  Lebrón now moves for dismissal of Count One under Fed.R.Crim.P. 12(b)(3).  In his view, while the statute applies to Puerto Rico, it does not extend to transportation that takes place exclusively within Puerto Rico.

## II.   **DISCUSSION**

A. <u>Statutory Background</u>

Section 2422 was originally enacted in 1910 as part of the Mann Act, also known as the "White Slave Traffic Act," 36 Stat. 825, Ch. 395 (1910) (codified as amended at 18 U.S.C. §§ 2421-2428). It is currently codified at Chapter 117 of Title 18 of the United States Code, titled "Transportation for Illegal Sexual Activity and Related Crimes." In 1998, Congress enacted "The Protection of Children from Sexual Predators Act" to, among other things, add subsection (b), dealing with coercion and enticement of minors. Pub. L. No. 105-314, 112 Stat. 2974 (1998). Thus, Section 2422 now reads:

> (a)      Whoever knowingly persuades, induces, entices, or coerces any individual to travel in interstate or foreign commerce, **or in any Territory or Possession of the United States**, to engage in prostitution, or in any sexual activity for which any person can be charged with a criminal offense, or attempts to do so, shall be fined under this title or imprisoned not more than 20 years, or both.

> (b)      Whoever, using the mail or any facility or means of interstate or foreign commerce, or within the special maritime and territorial jurisdiction of the United States knowingly persuades, induces, entices, or coerces any individual who has not attained the age of 18 years, to engage in prostitution or any sexual activity for which any person can be charged with a criminal offense, or attempts to do so, shall be fined under this title and imprisoned not less than 10 years or for life.

> 18 U.S.C. § 2422 (emphasis added).

Because Puerto Rico is a territory, it is apparent that Section 2422(a) applies here. But, in 1998 Congress also amended Section 2423 (a) – which initially read like Section 2422(a) currently reads – to include the term "commonwealth" before "territory or possession of the United States." So amended, that section states:

> (a)    Transportation with intent to engage in criminal sexual activity. – A person who knowingly transports an individual who has not attained the age of 18 years in interstate or foreign commerce, **or in any commonwealth, territory or possession of the United States**, with intent that the individual engage in prostitution, or in any sexual activity for which any person can be charged with a criminal offense, shall be fined under this title and imprisoned not less than 10 years or for life.

> 18 U.S.C. § 2423(a)(emphasis added).

Now, Section 2423(a) differs from Section 2422(a) in that Section 2423(a) explicitly applies to intra-commonwealth transportation whereas Section 2422(a) does **not** include the term "commonwealth," instead referring to travel in interstate or foreign commerce, or in any "Territory or Possession of the United States."  By extension, Lebrón argues that Puerto Rico is no longer a territory or possession of the United States but a commonwealth, and since Section 2422(a) does **not** contain the term "commonwealth," it does **not** apply to acts that take place wholly within Puerto Rico (Docket No. 24 at pp. 5, 8).[1]  For support, he directs the court's attention to United States v. Mercado-Flores, ---F.Supp.3d----, 2015 WL 3764518 (D.P.R. June 4, 2015).

---

[1] In 1952, the name of Puerto Rico changed to "Estado Libre Asociado de Puerto Rico" (which literally translated means "Associated Free State of Puerto Rico"), yet is known or referred to in English- as "Commonwealth of Puerto Rico." Between 1900 and 1932, Puerto Rico was officially misspelled as "Porto Rico" as a result of the incorrect spelling of the Island's name in the English version of the Treaty of Paris in 1898.  See, Igartúa de la Rosa v. United States, 417 F.3d 145, 161 n.28 (1st Cir. 2005)(Torruella, J., dissenting)(so noting); José A. Cabranes, *Citizenship and the American Empire: Notes on the Legislative History of the United States Citizenship of Puerto Ricans*, 127 U.PA.L.Rev. 391, n.1 (1979)(same).  The incorrect spelling was thereafter used in the Foraker Act in 1900, after which it took 32 years to persuade Congress that "Porto" is Portuguese and that the correct Spanish name should be restored.  Igartúa-de la Rosa, 417 F.3d at 161 n.28 (so stating). This was finally done by joint resolution in 1932.  See, Joint Resolution to change the name of "Porto Rico" to "Puerto Rico," Act of May 17, 1932, ch. 190, 47 Stat. 158 (1932).  Contrary to what the phrase "Associated Free State" suggests, Puerto Rico's relationship with the United States is not one of "free association." The United States does have relationships with free associated republics: The Federated States of Micronesia, The Republic of the Marshall Islands, and The Republic of Palau.  As will be discussed below, these are former Trust Territories of the United Nations which have entered into treaties of free association with the United States.  Duffy & Marshall, *Between the Foreign and the Domestic: The Doctrine of Territorial Incorporation, Invented and Reinvented*, in *Foreign in a Domestic Sense: Puerto Rico, American Expansion, and the Constitution*, 34 n.65 (Duke 2001).  Free association agreements may be unilaterally terminated by any of the parties.  See, Gerald L. Newman, *Constitutionalism and Individual Rights in the Territories*, in Duffy & Marshall, *supra* at 183, (". . . Freely Associated States have delegated certain functions normally associated with sovereignty to the United States, while maintaining their own sovereign powers exclusively themselves under a treaty arrangement that is subject to unilateral termination by either party").

In that case, the defendant was charged pursuant to Section 2421 with transporting the victim solely within Puerto Rico.[2]  The court dismissed the count after finding that Puerto Rico is a Commonwealth, not a territory or possession.  To the extent that Section 2421 makes it a federal crime to transport any individual with the intent to engage in criminal sexual activity "in interstate or foreign commerce, or in any Territory or Possession of the United States," the court held it was inapplicable to Puerto Rico.[3]  After Mercado-Flores, another court in this District also held that Section 2421 does not criminalize conduct occurring entirely within Puerto Rico because Puerto Rico is a Commonwealth, albeit one subject to the Territorial Clause.  See, United States v. Maldonado-Burgos, ---F.Supp.3d----, 2015 WL 5227480 (D.P.R. September 8, 2015)(so concluding).

Both Mercado-Flores and Maldonado-Burgos[4] rely in part on Córdova & Simopietri Insurance Agency, Inc. v. Chase Manhattan Bank N.A., 649 F.2d 36 (1st Cir. 1981).  There, the First Circuit considered whether the framers of the Sherman Act of 1887 would have intended Puerto Rico to be treated as a "state" or a "territory" in light of the subsequent enactment of the Federal Relations Act, and the promulgation of the Puerto Rico Constitution in 1952.  Id. at 39.

Section 1 of the Sherman Act forbids agreements "in restraint of trade or commerce among the several states," whereas Section 3(a) prohibits agreements "in restraint of trade or commerce in any Territory of the United States."  15 U.S.C. §§ 1 and 3(a).  In 1937, the Supreme Court held that Section 3 applied to Puerto Rico. Puerto Rico v. Shell Co., 302 U.S. 253 (1937).  In 1981,

---

[2] Section 2421 states that "[w]hoever knowingly transports any individual in interstate or foreign commerce, or in any Territory or Possession of the United States…" 18 U.S.C. § 2421.  Like in Section 2422(a), the term "commonwealth" is lacking.

[3] The government appealed the dismissal.  The appeal is pending.  See, United States v. Mercado-Flores, USCA No. 15-1859.

[4] The opinions contain well documented reference to caselaw, statutory provisions, and background historical events, and provide a useful framework to analyze the question sub judice.

however, the First Circuit held that the framers of the Sherman Act would have intended to treat Puerto Rico as a "state" rather than a territory after the Federal Relations Act and the local Constitution, and for that reason, concluded that Section 3 of the Sherman Act does not apply in Puerto Rico. Córdova & Simopietri Insurance Agency, Inc., 649 F.2d at 42.[5]  It explained that as a general matter, the Sherman Act ceases to apply to purely local affairs once territories become states, leaving state governments free to enact various antitrust laws broadly consistent with general federal policy, but occasionally divergent as to details. Id. at 41-42.  And since the Federal Relations Act and the Puerto Rico Constitution were intended to accord to Puerto Rico a degree of autonomy and independence normally associated with a State of the Union, it concluded that there was no reason of policy discernible in the Sherman Act for treating Puerto Rico differently from a state.  Id.  That analysis does not necessarily lead to the same conclusion here.

As previously indicated, Section 2421(a) was enacted prior to the Federal Relations Act. In consequence, it applied to Puerto Rico before that legislative milestone.  See, Crespo v. United States, 151 F.2d 44 (1st Cir. 1945)(applying Mann Act to acts occurring wholly within the territories and possessions of the United States, including Puerto Rico).  Still, the First Circuit has not evaluated the relationship between the current versions of Sections 2421(a) and 2423.  But it examined an analogous question in United States v. Villarin-Gerena, 553 F.2d 723 (1st Cir. 1977). In that case, defendant was a member of the Puerto Rico Police Force charged and convicted for striking a citizen several times and arresting him without probable cause in violation of 18 U.S.C. § 242.  The statute reads:

> [w]hoever, under color of any law, statute, ordinance, regulation, or
> custom, willfully subjects any inhabitant of any State, Territory, or

---

[5] Subsequent to Córdova and Shell, Section 3 of the Sherman Act was amended to include a second subsection related to illegal monopolizations.  For that reason, when Córdova and Shell refer to Section 3, it is the functional equivalent to what is now Section 3a.

United States v. Lebrón-Cáceres
Criminal No. 15-279 (PAD)
Opinion and Order
Page 7

> District to the deprivation of any rights, privileges, or immunities
> secured or protected by the Constitution or laws of the United States,
> or to different punishments, pains, or penalties, on account of such
> inhabitant being an alien, or by reason of his color, or race, than are
> prescribed for the punishment of citizens, shall be fined not more
> than $1,000 or imprisoned not more than one year, or both; and if
> death results shall be subject to imprisonment for any term of years
> or for life.[6]

The defendant argued that the statute, which lacks the term "commonwealth," does not apply to conduct in Puerto Rico. He noted that Section 242 had been amended subsequent to Puerto Rico becoming a commonwealth, but that it still remained textually silent as to its applicability to commonwealths or Puerto Rico. He pointed out that, in contrast, a related statute (Section 245) included an explicit reference to commonwealths.[7] Thus, he claimed that Congress intended to exclude Puerto Rico from the reach of Section 242. Villarin-Gerena, 553 F.2d at 726.

The First Circuit rejected the argument, reasoning that "it was not necessary for the Congress to alter specifically all outstanding statutes thereto previously applicable in order to continue their effectiveness in Puerto Rico after it became a commonwealth in 1952." Id. This was so due to the general savings clause of the Federal Relations Act (48 U.S.C. § 734), to the effect that the statutory laws of the United States not locally inapplicable (as was the statute at issue), shall have the same force and effect in Puerto Rico as in the United States. Id.[8] For that reason, the statute continued applying in Puerto Rico.

---

[6] The statute has since been amended.

[7] 18 U.S.C. § 245 provided, in part, that "[n]othing in this section shall be construed as indicating an intent on the part of Congress to prevent any State, any possession or Commonwealth of the United States, or the District of Columbia, from exercising jurisdiction over any offense over which it would have jurisdiction in the absence of this section …."

[8] More precisely, Section 734 states that "[t]he statutory laws of the United States not locally inapplicable, except as hereinbefore or hereafter otherwise provided, shall have the same force and effect in Puerto Rico as in the United States …" 48 U.S.C. § 734. Although each statute must be examined independently to determine whether the "locally inapplicable exemption" applies, this provision has been "narrowly interpreted." See, Rivera-Torres, 826 F.2d at 154 (so stating). Thus, in El Vocero de Puerto Rico v. Puerto Rico, 508 U.S. 147 (1993), the Supreme Court specifically rejected the Puerto Rico Supreme Court's reliance on "the unique history and traditions of the Commonwealth," including a "special concern for the honor and reputation of the citizenry," as irrelevant to the established nationwide standard for evaluating the media's First Amendment right of access to preliminary

That reasoning leads to the same conclusion in this case: Section 2421(a) applies to Puerto Rico despite its textual omission of the term "commonwealth." Prior to 1952, Section 2421(a) applied to the territory of Puerto Rico. Crespo, 151 F.2d at 44. The addition of "commonwealth" to the statute did not render the section inapplicable in light of the general savings clause of the Federal Relations Act. The fact that Section 2421(a) still does not explicitly mention Commonwealth or Puerto Rico despite having been amended after Puerto Rico's commonwealth era began, does not mean that Congress intended to exclude Puerto Rico from the scope of Section 2421(a). In like manner, that Section 2423(a) – the sister statute of Section 2421(a) – was amended to expressly mention "commonwealth" does not dictate a different result, for in light of the Federal Relations Act's savings clause "it was not necessary for the Congress to alter specifically all outstanding statutes thereto previously applicable in order to continue their effectiveness in Puerto Rico after it became a commonwealth in 1952." Villarin-Gerena, 553 F.2d at 726 (quoting Moreno-Rios v. United States, 256 F.2d 68, 71-72 (1st Cir. 1958)).

The court in Maldonado-Burgos, reached the same conclusion, but pointed out that defendant's motion had to be granted and the indictment dismissed, noting that Section 2421 (a) applies differently to states and territories. Then, based on Córdova, 649 F.2d at 39, it reasoned that if the framers of Section 2421(a) had been aware of Puerto Rico's current status they would have intended it to be treated as a state based on the enactment of the Federal Relations Act and

proceedings in criminal cases. Id. at 149-150. All in all, Congress had used the phrase "not locally inapplicable" with reference to every territory starting in 1861 and again in 1878 with reference to the territories as a whole in the blanket provision of Section 1891 of the Revised Statutes, 18 Stat. at 333. See, Duffy Burnett, Christina, *Untied States: American Expansion and Territorial Deannexation*, 72 U.Chi.L.Rev. 797, 827 n.131 (2005)(so noting in discussing historical background of phrase). It did not use it in connection with the Philippine Organic Act of 1902 ("An Act Temporarily to Provide for the Administration of the Affairs of Civil Government in the Philippine Islands, and for Other Purposes"), the Jones Act of 1916 ("An Act to Declare the Purpose of the People of the United States as to the Future Political Status of the People of the Philippine Islands, and to Provide a More Autonomous Government for the Islands"), or the Philippine Independence Act of 1934 ("An Act to Provide for the Complete Independence of the Philippine Islands, to Provide for the Adoption of a Constitution and a Form of Government for the Philippine Islands, and for Other Purposes"). See, 32 Stat. 691, 39 Stat. 545, and 48 Stat. 456, respectively.

the promulgation of the Puerto Rico Constitution.  See, Maldonado-Burgos, 2015 WL 5227480 at *10-11.  The court parts ways with its sister court because, among other things, Congress enacted the amended versions of Section 2421(a) and Section 2423(a) in 1998, after, rather than before, the Federal Relations Act and the Puerto Rico Constitution went into effect in 1952.  So, at least in theory, Congress was aware of both provisions when it decided to amend Sections 2421(a) and 2423(a).

Along the same lines, the court in Maldonado-Burgos stated that Congress also amended 18 U.S.C. § 2426 in 1998, to include within the definition of "State" the term "commonwealth." The amended provision textually deals with penalties for repeat offenders.[9]  Yet in the end, it does not require the result that Lebrón advocates for.  See, Mercado-Flores, 2015 WL 3764518 at *7 (noting in evaluating the significance of the added language, that it is to be generally presumed that Congress acted intentionally and purposely in the disparate inclusion and exclusion, but because the rule allows only for a general presumption concerning the intent of Congress, the court continued the analysis into other areas of inquiry)  For guidance, then, the court turns to the subject of territoriality under the Constitution and its interplay with developments in the relationship

---

[9] § 2426. Repeat offenders

    (a)    Maximum term of imprisonment.--The maximum term of imprisonment for a violation of this chapter after a prior sex offense conviction shall be twice the term of imprisonment  otherwise provided by this chapter, unless section 3559(e) applies.

    (b)    Definitions.--In this section--
        (1)    the term "prior sex offense conviction" means a conviction for an offense--
            (A)  under this chapter, chapter 109A, chapter 110, or section 1591; or
            (B)  under State law for an offense consisting of conduct that would have been an  offense under a chapter referred to in paragraph (1) if the conduct had occurred  within the special maritime and territorial jurisdiction of the United States; and
        (2)    the term "State" means a State of the United States, the District of Columbia, and  any commonwealth, territory, or possession of the United States.

between the United States, Puerto Rico, and other entities subject to Congressional territorial authority.

B.  Territoriality

The Territorial Clause gives Congress authority to "make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States." U.S.CONST. art. IV, § 3, cl. 2.  In the exercise of that authority, from time to time Congress established governments in the various territories that came under federal control.  Initially, territorial government was viewed as a transition step to statehood.

This progression came to a halt after the Spanish-American War of 1898, when the United States acquired Puerto Rico, the Philippines, and Guam from Spain.  Ending the "taken-for-granted" process of territorial absorption were the Supreme Court's decisions in the *Insular Cases*, where the Court examined whether the new island territories and other non-contiguous territories acquired prior to the Spanish American War – Alaska and Hawaii – were foreign or domestic for purposes of tariffs and other constitutional purposes.[10]

The cases established a vital distinction between incorporated territories and unincorporated territories, with the second category describing possessions of the United States

---

[10] The name *Insular Cases* is normally given to a series of nine decisions rendered in 1901: De Lima v. Bidwell, 182 U.S. 1 (1901); Goetze v. United States, 182 U.S. 221 (1901); Crossman v. United States, 182 U.S. 221 (1901); Dooley v. United States, 182 U.S. 222 (1901); Armstrong v. United States, 182 U.S. 243 (1901); Downes v. Bidwell, 182 U.S. 244 (1901); Huus v. New York and Porto Rico Steamship Company, 182 U.S. 392 (1901); Dooley v. United States, 183 U.S. 151 (1901) (Dooley II); and Fourteen Diamond Rings v. United States, 183 U.S. 176 (1901).  Seven of those cases arose from Puerto Rico, one from Hawaii, and one from the Philippine Islands.  Some authors have extended the name to another set of cases decided from 1903 to 1914, and in 1922, dealing with the same or related questions.  These are Hawaii v. Mankichi, 190 U.S. 197 (1903); Gonzales v. Williams, 192 U.S. 1 (1904); Kepner v. United States, 195 U.S. 100 (1904); Dorr v. United States, 195 U.S. 138 (1904); Mendezona v. United States, 195 U.S. 158 (1904); Rassmussen v. United States, 197 U.S. 516 (1905); Trono v. United States, 199 U.S. 521 (1905); Grafton v. United States, 206 U.S. 333 (1907); Kent v. Porto Rico, 207 U.S. 113 (1907); Kopel v. Bingham, 211 U.S. 468 (1909); Dowdell v. United States, 221 U.S. 325 (1911); Ochoa v. Hernández, 230 U.S. 139 (1913); and Ocampo v. United States, 234 U.S. 91 (1914); and Balzac v. Porto Rico, 258 U.S. 298 (1922).  Of the 13 cases decided from 1903 and 1914, 5 originated in actions relating to Puerto Rico, 6 referred to the Philippines, one to Hawaii, and another to Alaska.  The 1922 case originated in Puerto Rico, and reaffirmed the doctrine of incorporation.

not necessarily thought of as future States.[11]  The distinction originated in the concurring opinion of Justice White in Downes, 182 U.S. at 244; was first adopted by a majority of the Court in Dorr, 195 U.S. at 138; and eventually persuaded a unanimous Court to endorse it as the exclusive basis for the decision in Balzac, 258 U.S. at 298.  In that process, the Supreme Court considered the scope of the term "the United States" under various clauses of the Constitution such as the Revenue Clause (Art. I, § 8), the Citizenship Clause (Amend. XIV, § 1), and the Thirteenth Amendment's prohibition of slavery and involuntary servitude (Amend. XIII, § 1), concluding that Puerto Rico is an unincorporated territory of the United States.  Balzac, 258 U.S. at 304.

Puerto Rico is not unique in that regard, for the same category of unincorporated territory has been used to describe the relationship of the United States with other areas, including the Philippines until 1946, Guam, American Samoa, the United States Virgin Islands, and the Northern Marianas Islands.[12]  Hooven & Allison Co. v. Evatt, 324 U.S. 652, 678 (1945)(stating that the Philippines were ". . territories belonging to, but not a part of the Union of states under the Constitution. . ."); United States v. Drake, 543 Fed.3d 1080, 1085 (9th Cir. 2008)(noting that Guam is an unincorporated territory); United States v. Lee, 472 F.3d 638, 639 (9th Cir. 2006)(describing American Samoa as an unincorporated territory); Tuaua v. United States, 951 F.Supp.2d 88, 98 (D.D.C. 2013), aff'd 788 F.3d 300 (D.C.Cir. 2015) (referring to Northern Mariana Islands as an unincorporated territory); Ballentine v. United States, 486 F.3d 806, 811 (3d Cir. 2007)(same as to the United States Virgin Islands).

---

[11] In general, unincorporated territories belong to, but are not a part of the United States.  They are regarded as ". . .foreign . . .in a domestic sense."  See, Downes, 182 U.S. at 341-342, 347.

[12] The designation applies to both inhabited and uninhabited territories over which the United States exercises sovereignty.  For a multi-dimensional study of U.S. territories, see, U.S. Gov't Accountability Off., GAO/OGC 98-5, *U.S. Insular Areas: Application of the U.S. Constitution* (1997).

United States v. Lebrón-Cáceres
Criminal No. 15-279 (PAD)
Opinion and Order
Page 12

In this Incorporation/Unincorporation framework, the Constitution does not apply in full to acquired territory until such time as the territory is incorporated into, or made a part of the United States by Congress.  See, Boumediene v. Bush, 553 U.S. 723, 757-758 (2008)(explaining that under the doctrine of territorial incorporation, "the Constitution applies in full in incorporated Territories surely destined for statehood but only in part in unincorporated Territories"); Torres v. Commonwealth of Puerto Rico, 442 U.S. 465, 469 (1979)(noting that an unincorporated territory is not subject to all the provisions of the Constitution).

Preincorporation, Congress is not restricted except in 2 instances: (1) where constitutional provisions flatly prohibit Congress from enacting certain types of laws; and (2) in case of fundamental constitutional rights.  See, United States v Verdugo-Urquidez, 494 U.S. 259, 268 (1989)(pointing out that only fundamental constitutional rights are guaranteed to inhabitants of unincorporated territories); Boumediene, 553 U.S. at 758 (same).[13]  Otherwise, Congress may treat territories differently than states provided it has a rational basis for that treatment.  Harris, 446 U.S. at 651.  In this sense, unincorporated territories are subject to the plenary power of Congress subject to (1) structural constitutional limitations; (2) fundamental constitutional rights; and (3) the need for a rational basis for congressional action.

The framework has accorded Congress significant flexibility to establish and modify arrangements directly impacting territories subject to its dominion.  See, Commonwealth of Northern Mariana Islands v. Atalig, 723 F.2d 682, 690 (9th Cir. 1984)(explaining that this approach affords Congress flexibility in administering offshore territory); Torres, 442 U.S. at 470

---

[13] See also, Government of the Canal Zone v. Ward, 502 F.2d 566, 568 (5th Cir. 1974)(pointing out that the Constitution does not require the extension of all protections of the bill of rights to inhabitants of "a territory not incorporated into the United States"). Nevertheless, Congress may extend non-fundamental federal constitutional rights to unincorporated territories.  Drake, 543 F.3d at 1085.

(recognizing Congress' ability to govern unincorporated territories); Tuaua, 788 F.3d at 307-308 (noting pragmatic character of incorporation framework in assessing applicability of rights to unincorporated territories).[14]

In the case of Puerto Rico, as more fully discussed below, the framework has allowed the United States to: provide for various forms of internal government, beginning with a 2-year period of military rule, to eventually authorize Puerto Rico to draft its own internal constitution, within the limitations imposed by Congress; experiment with a variety of fiscal measures, including granting and dismantling tax exemption schemes; made available to the population some of the social and economic programs provided for residents of the states, albeit with caps on the access that those residing in Puerto Rico may have to such programs, irrespective of their condition as citizens of the United States; allow Puerto Rico to authorize its municipalities to seek federal bankruptcy relief and subsequently exclude Puerto Rico from that Bankruptcy Code provision; withhold from the residents of Puerto Rico full participation in the adoption of federal legislation that directly affects them; and extend United States citizenship without purporting to incorporate Puerto Rico.[15]

---

[14] Although each of the inhabited U.S. territories has different characteristics arguably allowing for difference in congressional treatment, they have several features in common: (1) Congress governs them pursuant to its power under the Territorial Clause; (2) none is a sovereign independent country or a state of the Union; (3) people born in the territories are U.S. citizens, or, in the case of American Samoa, U.S. "nationals;" (4) all are affected by federal legislation at the sole discretion of Congress; and (5) none has voting representation at the federal level.  See, Duffy & Marshall, supra, at 102 (so noting in discussing origin, legacy and a number of issues raised by the Insular Cases).

[15] Also, Congress inserted Puerto Rico - but not the United States Virgin Islands and the Northern Mariana Islands - within the full scope of the Merchant Marine Act of 1920, known as the "Jones Act."  In general, the Jones Act, one of the cabotage laws of the United States, requires that maritime transport of cargo between points in the United States be carried by vessels that are (1) owned by U.S. citizens and registered in the United States, (2) built in the United States, and (3) operated with predominantly U.S. citizen crews.  Pub. L. No. 66-261, 41 Stat. 988, 999 (codified as amended at 46 U.S.C. § 55102).  However, registry endorsements excluding "U.S.-build" requirements may be issued to vessels to engage in trade with Guam and American Samoa under 46 U.S.C. § 12111(b).  For a documented discussion of different aspects of this subject, including market structure and tradeoffs, costs and benefits of potential changes in legislation, see, U.S. Gov't Accountability Off., GAO 13-260, Characteristics of the Island's Maritime Trade and Potential Effects of Modifying the Jones Act (2013).

United States v. Lebrón-Cáceres
Criminal No. 15-279 (PAD)
Opinion and Order
Page 14

C. Puerto Rico's Relationship with the United States

The evolving relationship between Puerto Rico and the United States confirms Puerto Rico's territorial status. Spain ceded Puerto Rico to the United States by way of the treaty negotiated to end the Spanish American War of 1898. See, Treaty of Peace between the United States of America and the Kingdom of Spain, December 10, 1898, 30 Stat. 1754, 1755 (*proclaimed* on Apr. 11, 1899)("Article II. Spain cedes to the United States the island of Porto Rico. . .").[16] Respecting the role of Congress, Article IX of the Treaty provides that: "The civil rights and political status of the native inhabitants of the territories hereby ceded to the United States shall be determined by the Congress." Hence, congressional authority was recognized at the inception of United States' assertion of sovereignty over the Island.

From 1898 until 1900, Puerto Rico was under a military government.[17] On April 12, 1900, Congress enacted the Foraker Act, establishing a civilian government. 31 Stat. 77-86, P.R. Laws Ann. tit. 1, Historical Documents. In that regard, it provided for a Governor, a Legislature, and a

---

[16] Specifically, Spain ceded Puerto Rico and Guam, sold the Philippines for $20 million, and relinquished all claims to sovereignty over Cuba. See, Treaty of Paris, 30 Stat.1755-56 (Arts. I-III).

[17] On July 25, 1898, the United States invaded Puerto Rico. On August 12, 1898, the United States and the ambassador of France, acting by authority of Spain, agreed upon the terms of a peace protocol, which became immediately effective. *Documents on the Constitutional History of Puerto Rico*, 53 (1954). On October 1, 1898, by General Order 158, Adjutant-General's Office, the military geographical department of Puerto Rico was created, and Maj. Gen. John R. Brooke, U.S. Army, was directed to assume command. By Order No. 1 of October 18, 1898, Headquarters Department of Puerto Rico, General Brooke assumed command of that Department and took up duties the duties of military governor. On December 9, 1898, he was replaced by Maj. Gen. Guy V. Henry. On April 11, 1899, the Senate ratified the Peace Treaty between the United States and Spain. On May 9, 1899, General Henry was replaced by Brig. Gen. George W. Davis. On April 12, 1900, Congress established a civilian government. On May 1, 1900, on orders from the Secretary of War, the military governor transferred control over civil affairs to civilian authorities, thus ending the military government. *Documents on the Constitutional History of Puerto Rico, supra*, at 54. On this topic, J. López Baralt, *The Policy of the United States Towards Its Territories With Special Reference to Puerto Rico*, 192- 195 (EDUPR 1999), describes the legal landscape of Puerto Rico under American military rule, including General Orders issued by military authority during that period. See also, Ochoa v. Hernández y Morales, 230 U.S. 139 (1913)(discussing authority of military government between occupation and Foraker Act in context of General Order issued after signature of peace treaty but prior to its ratification); Santiago v. Pons, 214 U.S. 260 (1909)(same with respect to General Order issued after ratification, albeit before enactment of statute establishing civil government); Dooley, 182 U.S. 222 (evaluating customs duties prescribed by military commanders for Puerto Rico).

Judiciary, maintaining in force existing legislation with amendments and modifications effected by Military Orders, which in themselves were ratified.[18]

Executive authority was then vested in a Governor appointed by the President.  Id. at Section 17.  The Governor exercised the full gamut of executive power: to pardon, commission officers, appoint officials, veto legislation, act as commander-in-chief of the militia, and execute the laws.  Id.

Legislative power was vested in a Legislative Assembly consisting of two (2) Houses.  Id. at Section 27.  The upper branch consisted of an Executive Council of 11 members appointed by the President.  Six (6) of the 11 also functioned as executive heads of important government agencies.  Of the 11, 5 were required to be native inhabitants of Puerto Rico.  Id. at Section 18.  The lower branch was a house of 35 delegates elected to two (2) year terms.  Legislative authority extended to all matters of a legislative character not locally inapplicable.  All laws were to be reported to the Congress, which reserved the power and authority to annul them.  Id. at Section 31.

The judicial power was vested in the courts and tribunals already established and in operation.  The President appointed Justices of the Supreme Court, with the consent of the United States Senate, while the Governor appointed lower court judges with the consent of the Executive Council.  Id. at Section 33.   Additionally, a United States District Court was created as the successor to the United States Provisional Court established by General Order 88 during the period of military rule.  Id. at Section 34.  Writs of error and appeal could be taken to the Supreme Court of the United States from the final decisions of the Supreme Court of Puerto Rico and the Territorial District Court of the United States in Puerto Rico.  Id. at Section 35.  The Foraker Act also created

---

[18] Congress amended 2 provisions in existing laws.  It annulled Article 83 of the Civil Code, which prohibited the marriage of priests and ministers, and amended Article 105 of the Civil Code to include adultery by the husband as a cause for divorce.  See, José López-Baralt, *The Policy of the United States Towards its Territories with Special Reference to Puerto Rico*, supra (so noting).

the office of Resident Commissioner entitled to official recognition as such by all departments upon presentation to the Department of State of a certificate of election.  Id. at Section 39.  All statutory laws of the United States not locally inapplicable except internal revenue laws, would have the same force and effect in Puerto Rico as in the United States.  Id. at Section 14.

In 1917, Congress enacted the Jones Act, providing for a popularly elected bicameral legislature and a bill of rights, and granting United States Citizenship to the people of Puerto Rico. 39 Stat. 951, P.R. Laws Ann. tit. 1, Historical Documents.   The Act replaced the Executive Council with a Senate elected by popular vote.  Id. at Section 26.  The Senate shared the appointing power with the Governor.  With the exception of Supreme Court Justices, the Attorney General, the Commissioner of Education and the Auditor, all appointed by the President with the advice and consent of the United States Senate, all other executive and judicial appointments made by the governor had to meet the consent of the Senate of Puerto Rico.  The President was authorized to veto bills passed over the governor's veto. Id. at Section 34.  All statutory laws of the United States not locally inapplicable except internal revenue laws would have the same force and effect in Puerto Rico as in the United States. Id. at Section 9.

In 1947, Congress enacted the Elective Governor Act, allowing the residents of Puerto Rico to elect their own governor.  Pub. L. No. 80-362, 61 Stat. 770.  The elective governor was granted the full range of executive authority including the appointing power over all executive positions, subject only to the consent of the Puerto Rico Senate.  Only the Auditor and Justices of the Supreme Court of Puerto Rico continued to be subject to Presidential appointment.  The President was authorized to exempt Puerto Rico by Executive Order from any Federal statute not expressly applied to Puerto Rico by Congress which he deemed inapplicable by reason of local conditions. Id. at Section 6.  Moreover, the Act provided that "[t]he rights, privileges, and immunities of

citizens of the United States shall be respected in Puerto Rico to the same extent as though Puerto Rico were a State of the Union and subject to the provisions of paragraph 1 of section 2 of article IV of the Constitution of the United States."  Id. at Section 7.

In 1950, Congress enacted Public Law 600. Pub. L. No. 81-600, 64 Stat. 319, authorizing the people of Puerto Rico to organize a government pursuant to a Constitution of their own adoption.  There was to be a referendum to determine if there was popular support for the idea of a Puerto Rican-created charter of government.  If a majority was found to exist, the referendum was to be followed by a constitutional convention called by the legislature of Puerto Rico.  After the convention had drafted the constitution, voters were to decide if they approved it.  The constitution had to provide a republican form of government and include a bill of rights.  Once ratified, it had to be approved by the President, and then pass approval by Congress before it could become effective.  The statute retained a non-voting Resident Commissioner to Washington.

In 1952, voters in Puerto Rico adopted the constitution.  Congress approved the proposed constitution with the exception of 2 sections that it eliminated, and 2 amendments that it imposed.  Pub. L. No. 82-447, 66 Stat. 327.[19]  Voters in Puerto Rico accepted the amendments.  Congress repealed the provisions of the Jones Act dealing with internal government, maintaining those dealing with the relationship between the United States and Puerto Rico, and Commonwealth was proclaimed.  The unrepealed provisions were titled the Puerto Rican Federal Relations Act.[20]

---

[19] Congress deleted Section 20 of Article II of the proposed constitution (which included rights to obtain work; food, clothing, housing and medical care; and protection in sickness, old age or disability), and prevented Puerto Rico from restoring those provisions later.  66 Stat. 327 (requiring language specifying that any amendment or revision of the constitution must be consistent with, inter alia, Congress' approving resolution).  Also, it required as addition to Section 5 of Article VII, the declaration that "Compulsory attendance at elementary public schools to the extent permitted by the facilities of the state shall not be construed as applicable to those who receive elementary education in schools established under nongovernmental auspices."

[20] In 1961, Congress enacted Public Law 189, providing for review of Puerto Rico Supreme Court judgments by the United States Supreme Court.  Until that time, the First Circuit reviewed those judgments.  Pub. L. No. 87-189, 75 Stat. 417 (1961).  In 1966, Congress promulgated Public Law 89, transforming the Article IV federal district court in Puerto Rico to an Article III Court.  Pub. L. No. 89-571, 80 Stat. 764 (1966).

D.  Significance of Historical Developments.

Against this background, Lebrón argues that Puerto Rico is no longer a territory but a Commonwealth beyond the reach of 18 U.S.C. § 2241(a) (Docket No. 24 at pp. 5, 8).  The government contends otherwise, asserting Puerto Rico is a territory (Docket No. 29 at pp. 5-6, 11-14).  That a territory is called "Commonwealth" does not necessarily mean it is not a territory of the United States.  The Philippines were a territory until their independence in 1946, and yet, Congress established a civil government for the Commonwealth of the Philippines.[21]  The Commonwealth of the Northern Mariana Islands has been referred to as an unincorporated territory – Tuaua, 951 F.Supp.2d at 98 – notwithstanding the fact that the term "Commonwealth" is part of its name.[22]  Along the same line, see Detres v. Lions Building, 234 F.2d 596, 600 (7th Cir. 1956)(holding that "mere change of the name of Puerto Rico to Commonwealth of Puerto Rico" did not change Puerto Rico's status as "a territory" of the United States), and David M. Helfeld, *Congressional Intent and Attitude Toward Public Law 600 and the Constitution of the Commonwealth of Puerto Rico*, 21 Rev.Jur.U.P.R. 255, 307 (1952)("Though the formal title has been changed [from People of Puerto Rico to Commonwealth of Puerto Rico], in constitutional theory Puerto Rico remains a territory").[23]

---

[21] As indicated earlier, the United States acquired the Philippines by treaty at the close of the Spanish-American War.  In 1902, after a period of military rule, Congress enacted the Philippine Organic Act, 32 Stat. 691 (1902).  The United States then organized a tripartite system of government, over which it reserved ultimate control.  See, Valmonte v. Immigration and Naturalization Service, 136 F.3d 914, 917 (2d Cir. 1998)(recounting history).  In 1916, the organic statute was replaced by the Jones Act.  In 1934, Congress adopted the Philippine Independence Act, which provided for the adoption of a Philippine Constitution and the withdrawal of United States sovereignty 10 years later.  Id.  Citizens of the Philippines, formerly nationals of the United States, were to be treated as aliens under United States immigration laws.  Id.  In 1946, following World War II, the United States declared the Philippines to be an independent nation, terminating the Philippines' status as a United States territory.  Proclamation No. 2695, 60 Stat. 1352, 11 Fed. Reg. 7517 (1946), as cited in Valmonte, 136 F.3d at 917.

[22] On the nature of the relationship between the Commonwealth of the Northern Mariana Islands and the United States, S.Rep. No. 94-596, *2 (1976) asserts that "[a]lthough described as a commonwealth, the relationship is territorial in nature with final sovereignty invested in the United States and plenary legislative authority vested in the United States Congress."  See also, Nguyen v. United States, 539 U.S. 69, 72 (2003)(describing the District Court for the Northern Mariana Islands as an Article IV territorial court).

[23] Dr. Helfeld, a well-known constitutional scholar, is Professor Emeritus of the University of Puerto Rico.  He served as Dean of

United States v. Lebrón-Cáceres
Criminal No. 15-279 (PAD)
Opinion and Order
Page 19

Similarly, in 1937 the Supreme Court recognized that: "[t]he aim of the Foraker Act and the Organic [Jones] Act was to give Puerto Rico full power of local self-determination with an autonomy similar to that of the states and incorporated territories … The effect was to confer upon the territory many of the attributes of quasi-sovereignty possessed by the states – as for example, immunity from suit without their consent … 'A body politic' – a commonwealth – was created" (citations omitted).  Shell Co., 302 U.S. at 261-262.

On this formulation, Puerto Rico already existed as a commonwealth – a body politic – under a different name, before enactment of Public Law 600 and the Federal Relations Act.[24]  The assessment is unsurprising, for the Foraker Act declared the inhabitants of Puerto Rico, with some exceptions, citizens of Puerto Rico entitled to the protection of the United States.  And those inhabitants, together with citizens of the United States residing in Puerto Rico, were to constitute a body politic under the name "People of Puerto Rico."  The Act provided that the laws and ordinances then in force in Puerto Rico should continue in force and effect except insofar as they were inconsistent with the applicable statutory laws of the United States and with the provisions of the Foraker Act or which were altered thereafter pursuant to the provisions of that Act.  Even so, Puerto Rico was considered a territory.  See, People of Porto Rico v. Rosaly Castillo, 227 U.S. 270 (1913) (describing Puerto Rico as a territory).

---

the University's Law School from 1960 to 1974.

[24] In this connection, see, Bowoon Sangsa Co., Ltd. v. Micronesian Industrial Corporation, 720 F.2d 595, 600 (9th Cir. 1983)(referring to Guam as a United States commonwealth).  Even so, Guam has no separate sovereign status.  Ngiraingas v. Sánchez, 858 F.2d 1368, 1371 n.1 (9th Cir. 1988).  It elects government officials, its citizens participate politically, and the territory enjoys many of the trappings of a sovereign governmental entity.  However, the authority of its government is at all times subject to such alterations as Congress may see fit to adopt.  Id.  As to American Samoa, it has been a United States territory since 1900 when its traditional leaders ceded their sovereign authority to the United States.  Tuaua, 788 F.3d at 302.  Today, it possesses a popularly elected bicameral legislature and similarly elected governor.  Id.  In turn, the United States Virgin Islands have been a territory since 1917, when the United States acquired them from Denmark.  They enjoy a level of autonomy similar to that of states.  Harris, 233 F.2d at 114.

The Jones Act declared all inhabitants of Puerto Rico citizens of the United States, and expanded local self-government in the Island.  Nevertheless, the organized body politic of Puerto Rico was found to be a territory of the United States.  See, National Labor Relations Board v. González Padín Co., 161 F.2d 353, 355 (1st Cir. 1947)("... Puerto Rico is a completely organized territory, although not one incorporated into the United States. . . ")(citing Cases v. United States, 131 F.2d 916, 919, 920 (1st Cir. 1942)).  See also, Balzac, 258 U.S. at 304-308, 311-313 (describing Puerto Rico as a territory which has not been incorporated into the United States as distinguished from merely belonging to it, even though the Jones Act made citizens of Puerto Rico citizens of the United States; the statutory framework provided for review in the United States Supreme Court of Puerto Rico Supreme Court decisions in cases when the Constitution of the United States was involved; a United States District Court in Puerto Rico had been organized; and revenue, navigation, immigration, national banking, bankruptcy, federal employers' liability, safety appliance, extradition, and census laws had been extended in one way or another to Puerto Rico).

It has been pointed out that the purpose of Congress in the 1950-1952 legislation was to accord Puerto Rico the degree of autonomy and independence normally associated with states of the Union, Examining Bd. of Engineers, Architects and Surveyors v. Flores de Otero, 426 U.S. 572, 594 (1976), and thus, that with such autonomy Puerto Rico ceased being a territory.  See, Mercado-Flores, 2015 WL 3764518 at *6-*7 (so arguing).[25]  A similar purpose guided Congress, however, in enacting the Foraker Act in 1900 and the Jones Act in 1917.  See, Rosaly, 227 U.S. at 274 (explaining that purpose of the Foraker Act was "to give local self-government conferring an

---

[25] In Examining Bd, the Supreme Court invalidated a Puerto Rico statute requiring United States citizenship to practice civil engineering.  Although it stated that Puerto Rico assumed Commonwealth status in 1952, it made no attempt to distinguish its previous analysis regarding commonwealth in Shell, 302 U.S. at 261-262.  In any event, the Court was not called upon to assess Puerto Rico's status under the Constitution.

autonomy similar to that of the states"). Further, the same goal led Congress to enact the Jones Act. Specifically, the "aim of … [the Jones Act] was to give Puerto Rico full power of local self-government with an autonomy similar to that of the states …." Bacardi Corporation of America v. Domenech, 311 U.S. 150, 167 (1940). Notwithstanding congressional aim at self-government, Puerto Rico was held to be a territory. Shell, 302 U.S. at 261-262.

Against this backdrop, in 1952 Congress approved important changes in Puerto Rico's internal government structure, including authorization for Puerto Rico to appoint the Justices of the Puerto Rico Supreme Court and Puerto Rico's Attorney General. But the Jones Act contained two types of interrelated provisions: (1) those defining the political and economic relationship between the United States and Puerto Rico; and (2) provisions on local government. Public Law 600 left essentially intact the first type, allowing Puerto Rico to draft a Constitution to substitute the local government provisions of the Jones Act. In that regard, the Report of the House Committee on Public Lands recommending approval of S. 3336 (later enacted into Public Law 600), recognized that:

> [t]hose sections of the [Jones Act] pertaining to the political, social, and economic relationship of the United States and Puerto Rico concerning such matters as the applicability of the United States laws, customs, internal revenue, Federal judicial jurisdiction in Puerto Rico, Puerto Rican representation by a Resident Commissioner, etc., would remain in force and effect and upon enactment of S. 3336 would be referred to as the Puerto Rican Federal Relations Act. The sections of the [Jones Act] which [S. 3336] would repeal concern primarily the organization of the local executive, legislative and judicial branches of the government of Puerto Rico and other matters of purely local concern.

See, H.R. Rep. No. 81-2275 at 4 (1950). Thus, the court cannot discern any form of congressional authorization in 1950 or at any other point thereafter for Puerto Rico to modify provisions defining the relationship between Puerto Rico and the United States. The modifications legislated and

implemented between 1950 and 1952 left intact the basic territorial relationship established at the turn of the Twentieth Century.  They are insufficient to hold that Puerto Rico is no longer a territory. Detres, 234 F.2d at 599 (so noting).

As has been the case since the enactment of the Foraker Act in 1900, all federal legislation except that involving internal revenue applies in Puerto Rico unless locally inapplicable.  United States citizens in Puerto Rico cannot vote for President or elect voting representatives in Congress. Consistently with the Supreme Court's holding in Harris, Congress is empowered under the Territorial Clause to treat Puerto Rico differently from states so long as there is a rational basis for its actions.   446 U.S. at 651-652.   See also, Romeu, v. Cohen, 265 F.3d 118, 124 (2d Cir. 2001)("Given the deference owed to Congress [under the Territorial Clause], . . .  the . . . distinction between former residents of States now living outside the United States and former residents of States now living in the U.S. territories is not subject to strict scrutiny").  In the end, Puerto Rico possesses local autonomy over affairs of insular concern, except to the extent that those affairs are subordinated to federal exercise of power.

More to the point, under the Supremacy Clause the constitution and laws of Puerto Rico cannot limit the plenary power of Congress under the Territorial Clause, so as to provide for a relationship with the United States distinct to that provided by federal law.  Popular Democratic Party v. Com. of Puerto Rico, 24 F.Supp.2d 184, 195 (D.P.R. 1998).  The Federal Government is acknowledged by all to be one of enumerated powers.   National Federation of Independent Business v. Sebelius, ---U.S.----, 132 S.Ct. 2566, 2577 (2012)(quoting M'Culloch v. Maryland, 17 U.S. 316, 405 (1819)).  It can exercise only the powers granted to it.  Id.  The reach of those powers is broader still, however, because the Constitution expressly authorizes Congress to make all laws which shall be necessary and proper for carrying into execution its powers.   Id. at 2579.  As

previously stated, one of those powers is the power to make rules and regulations respecting territories and other property belonging to the United States. U.S. CONST. art. IV, § 3.  And there is no indication that at any point Congress has deprived itself of that power in legislating for Puerto Rico.

All territory within the jurisdiction of the United States not included in any state must necessarily be governed by or under the authority of Congress.  First Nat. Bank v. County of Yankton, 101 U.S. 129, 133 (1879).  Congress has the entire dominion and sovereignty, national and local, Federal and state, and full legislative power over all subjects upon which the legislature of a state might legislate within the state; and may, at its discretion, entrust that power to the legislative assembly of a territory.  Simms v. Simms, 175 U.S. 162, 168 (1899).  In the exercise of that power, it is not subject to the same constitutional limitations as when it is legislating for the United States, Hooven & Allison, 324 U.S. at 673; may authorize territories to enjoy a qualified form of sovereignty under United States rule, De Geofroy v. Riggs, 133 U.S. 258, 268-269 (1890); confer upon a territorial government an autonomy similar to that of states; Harris v. Boreham, 233 F.2d 110, 114 (3d Cir. 1956); and act "in a manner that would exceed its powers, or at least would be very unusual, in the context of national legislation enacted under other powers delegated to it." Palmore v. United States, 411 U.S. 389, 398 (1973).

From that perspective, territorial governments are entirely a creation of Congress.  United States v. Wheeler, 435 U.S. 313, 322 (1978).[26]  They owe all their powers to the statutes of the United States conferring on them the powers which they exercise, and which, as a Congressional

---

[26] In the same way, territories are akin to organized municipalities – a separate community, and in a certain sense, a state.  De Geofroy, 133 U.S. at 269.  They are a political subdivision under the outlying dominion of the United States.  Yankton, 101 U.S. at 133.  See, Late Corporation of the Church of Jesus Christ of Latter Day Saints v. United States, 136 U.S. 1, 43 (1890)(Congress "may do for the territories what the people, under the constitution of the United States, may do for the states").

delegation, are liable to be withdrawn, modified or repealed at any time by Congress.   United States v. Kagama, 118 U.S. 375, 379-380 (1886).[27]  What is more, the right of Congress to revise, alter and revoke delegated powers does not diminish the powers while they reside in the territory. Bluebeard's Castle, Inc. v. Government of the Virgin Islands, 321 F.3d 394, 397 (3d Cir. 2003). Congress retains plenary power over the territorial government until such time as the territory is made independent.  Hooven & Allison, 324 U.S. at 675.

There is no indication that – even if it could – Congress has surrendered any such power to Puerto Rico.  In contrast to Puerto Rico, the Northern Mariana Islands negotiated with the United States a "Covenant to Establish a Commonwealth of the Northern Mariana Islands in Political Union with the United States of America," ratified by Congress by joint resolution.  Pub. L. No. 94-241, 90 Stat. 263, 48 U.S.C § 1801.[28]  The Covenant established the Commonwealth as an

---

[27] Along the same line, see, District of Columbia v. John R. Thompson Co., 346 U.S. 100, 109 (1953)(D.C. home rule, like delegation of power of self-government to territories, remains subject to the power of Congress at any time to revise, alter, or revoke the authority granted).

[28] The Northern Mariana Islands are a chain of islands located in the Western Pacific Ocean, in the area known as Micronesia. Spain controlled them from the sixteenth century until the Spanish American War.  In 1898 after the war ended, Spain ceded Guam to the United States and sold the rest of the Marianas to Germany.  Saipan v. Director, 133 F.3d 717, 720 (9th Cir. 1998).  Germany's brief control ended with the commencement of World War I, when Japan took possession of all islands except Guam.  Id.  After World War I, Japan continued to govern most of what is now considered Micronesia, including the Northern Mariana Islands, under a mandate from the League of Nations.  Gale v. Andrus, 643 F.2d 826, 828 (D.C.Cir. 1980).  By the end of World War II, most of the Micronesian Islands were occupied by the United States military.  Saipan, 133 F.3d at 720.  In 1947, the United Nations designated Micronesia a strategic trust territory and appointed the United States as trustee or administering authority.  Id.; Gale, 643 F.2d at 828.  That year, military government was terminated, and administration of the Trust Territory was delegated to the Secretary of the Navy.  In 1951, some administrative responsibilities were transferred to the Interior Department.  In 1962, the authority for civil administration was redelegated to the Secretary of the Interior.  Pursuant to this authority, the Secretary of the Interior established a Trust Territory government, which included executive, legislative and judicial branches, with a High Commissioner as chief executive.  Juda v. United States, 6 Cl.Ct. 441, 444 (1984).  In 1969, the United States began negotiations with the inhabitants of the Trust Territory directed to establishment of a framework for transition to constitutional self-government and future political relationships.  Id.  During the negotiations, the Trust Territory became divided into 4 governmental entities: Northern Mariana Islands, Federated States of Micronesia, Republic of the Marshall Islands, and Republic of Palau.  Id.  In the case of the Northern Mariana Islands, negotiations culminated in the 1976 execution of the Covenant.  Wabol v. Villacrusis, 958 F.2d. 1450, 1458-1459 (9th Cir. 1992).  The Covenant was subsequently approved by the legislature, a plebiscite and Congress, and became law in March 1976.  Pursuant to Section 201 of the Covenant, the Commonwealth held a convention and drafted a constitution which was ratified by the people in March 1977.  It was approved by President Carter in October 1977.  Proclamation No. 4534 (1977).  See, Wabol, 958 F.2d at 1459 (describing developments).  The Covenant provides that upon termination of the Trusteeship Agreement, the Northern Marianas would become politically united with, and under the sovereignty of the United States.  Id.  The remaining former Trust Territories entered into compacts of free association with the United States: the Federated States of Micronesia (1986), the Republic of the Marshall Islands (1986), and the Republic of Palau (1994).

The court need not analyze in detail the nature of the former trust territories' relationship with the United States.  Suffice it to say

United States v. Lebrón-Cáceres
Criminal No. 15-279 (PAD)
Opinion and Order
Page 25

uncorporated territory of the United States.  Saipan, 133 F.3d at 720.  Among other things, it

provides that in order to respect the right of self-government guaranteed by the Covenant, the

United States agrees to limit the exercise of its authority so that the fundamental provisions of the

Covenant may be modified only with the consent of the Government of the United States and the

Government of the Northern Mariana Islands.  See, Art. I, Section 105 of the "Covenant to

Establish a Commonwealth of the Northern Mariana Islands in Political Union with the United

States of America," Pub. L. No. 94-241, 90 Stat. 263.  But no such provision exists as to Puerto

Rico.[29] Adoption of a Constitution, by delegation of Congress to organize a local government and

replace part of the Organic Act at the time, did not represent an irrevocable cession of

congressional sovereignty to legislate over Puerto Rico.  By extension, it leads to the conclusion

---

that United States' administration of the Trust Territory was based upon the President's treaty power conferred in Article II, Section 2, cl. 2 of the Constitution, rather than under the authority conferred upon Congress by the Territorial Clause.  Juda, 6 Cl.Ct. at 456. On that basis, the United States was not a sovereign power but a trustee.  Wabol, 958 F.2d at 1458.  Its authority derived from the trust itself.  Gale, 643 F.2d at 830.  The administration of the Trust Territory was subject to United Nations supervision and circumscribed by the United Nations Charter and the terms of the Trusteeship Agreement.  Id.  Therefore, the Trust Territory was not considered a territory or an insular possession of the United States.  In re Rothstein, 884 F.2d 490, 492 (9th Cir. 1984)("The Trust Territory of the Pacific Islands is not a territory nor an insular possession of the United States, but was only held under a trusteeship agreement with the Security Council of the United Nations"); People of Saipan v. United States Dept. of Interior, 502 F.2d 90, 95 (9th Cir. 1974)("[T]he Trust Territory is not a territory or possession of the United States") Juda, 6 Cl.Ct. at 457 ("The Trust Territory is not a territory of the United States, either incorporated or unincorporated").  And so in approving the Covenant with the Northern Mariana Islands, the federal government was constrained by the Trusteeship Agreement.  United States v. Covington, 783 F.2d 1052, 1055 (9th Cir. 1985), cert. denied 479 U.S. 831 (1986); Wabol, 958 F.2d at 1459.  In contrast, the sovereignty held by Spain over Puerto Rico was formally transferred to the United States by way of the Treaty of Paris.  Since then, the United States has administered Puerto Rico through legislation enacted under the Territorial Clause.  See, Cross v. Harrison, 57 U.S. 164, 193 (1853)(explaining that ceded territory comes under the sovereignty of the United States ". . . under the Constitution, by which power [has] been given to Congress to dispose of and make all needful rules and regulations respecting the territory or other property belonging to the United States . . . ").

[29] In 1963, the Office of Legal Counsel of the Department of Justice concluded that mutual consent provisions with a non-state area would be constitutional because, on that interpretation, Congress could vest rights in a political status.  See, Report by the President's Task Force on Puerto Rico's Status, Appendix E, p. 9 n.13 (2007)(so noting).  The Department modified its position during the administration of President Bush, concluding that those provisions lack validity.  It did so based on Supreme Court rulings on different, but related subjects, leading it to conclude that legislation concerning governance of a non-state area within U.S. sovereignty is necessarily subject to the Congressional power to amend and repeal; that such power cannot be contracted away; and that property rights do not include those arising from governmental relations so as to make them enforceable against the United States under the Due Process Clause.  Id., Appendix F, pp. 6-10 and cases cited therein.  It is not necessary to assess the relative strength of the Justice Department's position here.  But it is significant that not even when the Justice Department considered those provisions valid, Congress did not affirmatively opt to link the Federal Government to Puerto Rico through them.

that both "before and after the adoption and approval of its constitution [Puerto Rico] was a territory of the United States …" Detres, 234 F.2d at 600.

E.  Congressional Intent

Public Law 600 was enacted "in the nature of a compact."  From this phrase, it has been argued that Puerto Rico is not a territory.  See, Mercado-Flores, 2015 WL 3764518 at *8 (relying on phrase to support that conclusion).  The phrase, to say the least, is ambiguous.  Its enactment was not as a contract, or an agreement, or a covenant, or a compact as such, but "in the nature" thereof.  Still, it is apparent that Members of Congress most responsible for the enactment of Public Law 600 thought the enactment "would not change Puerto Rico to some political entity other than a territory."  Detres, 234 F.2d at 599 (so noting).

The Report of the House Committee on Public Lands recommending approval of S. 3336 (later enacted into Public Law 600), states that "Puerto Rico is 'unincorporated territory'." H.R. Rep. No. 81-2275, at 4 (1950).  It asserts that the bill's enactment "would be a fundamental contribution to the art and practice of the government and administration of Territories under the sovereignty of the United States." Id.  In like manner, it points out that "[b]y permitting the people of Puerto Rico to formulate and by their own initiative and choice adopt a constitution [Public Law 600] would further implement the self-government principle established by the Congress as the cornerstone and fundamental policy governing the relationship of the United States toward territories over which it has jurisdiction." Id. at 2.  On the nature and general scope of the bill, the Report even states that it "would not change Puerto Rico's fundamental political, social, and economic relationship to the United States." Id. at 3.

The Secretary of the Interior confirmed that Public Law 600 "would not change Puerto Rico's political, social, and economic relationship to the United States" or "preclude a future

determination by Congress of Puerto Rico's ultimate political status." *Puerto Rico Constitution Hearings Before the House Comm. On Public Lands*, 81st Cong. 163-164 (1950).  Puerto Rico's Resident Commissioner, Antonio Fernós-Isern, agreed that the legislation "would not change the status of the Island of Puerto Rico relative to the United States" and "would not alter the powers of sovereignty acquired by the United States over Puerto Rico under the terms of the Treaty of Paris." Id.  Similarly, when Congress approved the constitution of Puerto Rico, the accompanying reports reaffirmed that its approval "w[ould] not change Puerto Rico's fundamental political, social, and economic relationship to the United States," H.R. Rep. No. 1832, 82nd Cong., 2nd Sess. 7 (1952), and "would in no way impair[ ] " the exercise of Federal authority in Puerto Rico." S. Rep. No. 1720, 82d Cong., 2d Sess. 6 (1952).

From these legislative developments, Dr. David Helfeld concluded in 1952 that "[t]he 'compact' is not bilaterally binding in a legal sense. In Constitutional theory, Congress continues to possess plenary authority over Puerto Rico which, in status if not in title, remains a territory.  In actuality, Puerto Rico possesses local autonomy and has full control over affairs of insular concern – except to the extent that those affairs are effected by the federal exercise of power." D. Helfeld, *Congressional Intent and Attitude Toward Public Law 600 and the Constitution of the Commonwealth of Puerto Rico*, supra at 314.[30]  Congressional assertions of authority confirm it.

As a sister court in this District noted, in 1984 Congress acted unilaterally by not returning to the Treasury of Puerto Rico the excise tax on Puerto Rican-produced rum in excess of $10.50 a

---

[30] For the same reason, it has been pointed out that "there is no room for doubt that Public Law 600 (authorizing Puerto Rico to enact a constitution for local self-government) and its sequel, Law 447 (resolution approving Puerto Rico's Constitution), did nothing to change the underlying constitutional status of Puerto Rico as an unincorporated territory, subordinated to Congress' plenary powers under the Territorial Clause."  See, Igartía de la Rosa, 417 F.3d at 160 n.21 (Torruella, J. dissenting)(so stating); Popular Democratic Party, 24 Fed.Supp.2d at 193 ("Even after the enactment of Public Law 600, Congress has not hesitated to treat Puerto Rico as a territory").

gallon, notwithstanding Section 9 of the Federal Relations Act.  Popular Democratic Party, 24

Fed.Supp.2d at 193.  That Section provides that "taxes collected … on articles produced in Puerto

Rico and transported to the United States … shall be covered into the Treasury of Puerto Rico."

Id. at 194.  Similarly, in 1995, Congress terminated the 936 credit.  Section 936 permitted U.S.

corporations to offset the United States tax on their possessions income with a tax credit.  Tax

Reform Act of 1976, Pub. L. No. 94-455, sec. 1051, 90 Stat. 1643.  The Act defined Puerto Rico

as a possession.  Id.  Congress terminated the Section 936 credit, unilaterally, effective for all tax

years after December 31, 1995, with a limited phase out until December 31, 2005.  29 U.S.C. §

936, Small Business Job Protection Act of 1996, Pub. L. No. 104-188, Sec. 1601(a), 110 Stat.

1827.[31]

What is more, Congress legislates – and has consistently legislated since 1952 – without

the need for Puerto Rico's approval.  And it has no need for that approval.  Caribtow v.

Occupational Safety and Health Review Com'n, 493 F.2d 1064, 1066 (1st Cir. 1974)(so noting in

concluding that "[n]othing in the language or in the legislative history can realistically support any

other conclusion").  As stated in the Federal Relations Act, federal law applies to Puerto Rico

unless locally inapplicable.  The default is applicability of federal laws unless Congress intends

otherwise.  Those laws trump even the Constitution of Puerto Rico.  See, United States v. Acosta

Martínez, 252 F.3d 13 (1st Cir. 2001)(holding that federal death penalty act applies in Puerto Rico

notwithstanding the fact that the Puerto Rico Constitution prohibits the death penalty); United

---

[31] Carlos E. Díaz Olivo, *La Autonomía de Puerto Rico y sus Lecciones en Términos Fiscales y Económicos*, 74 Rev.Jur.U.P.R. 263 (2005), and Erick Negrón Rivera, *Beyond Section 936: A Suggested Departure from Tax-Sheltered Stagnation in Puerto Rico*, 47 Rev.Col.Abog. 143 (1986), provide a valuable overview of the evolution of U.S. fiscal policy toward Puerto Rico.  See also, Com. of Puerto Rico v. Blumenthal, 642 F.2d 622 (D.C.Cir. 1980)(analyzing fiscal provisions under Foraker Act and Jones Act in the context of a dispute related to the proper disposition of revenue, derived from a tax imposed by the United States on the initial sale of gasoline in the United States by a producer or importer, with respect to gasoline manufactured in Puerto Rico and the United States Virgin Islands).

States v. Quiñones, 758 F.2d 40 (1st Cir. 1985)(holding that although contrary to the Puerto Rico

Constitution, wiretapping pursuant to 18 U.S.C. § 2510 is appropriate in Puerto Rico because the

adoption of its constitution in no way altered the applicability of U.S. laws and federal jurisdiction

in Puerto Rico).[32]   In the end, the situation is unremarkable for it no more than reflects how

Congress viewed Puerto Rico's territorial relationship with the United States in enacting Public

Law 600 and the Federal Relations Act in 1950 and 1952.  See,  Nestle Products, Inc. v. United

States, 310 F.Supp. 792, 796 (Customs Court 1970)("In view of the intent of Congress … it is clear

that the 'compact' legislation was at most regulatory, and did not change Puerto Rico's

fundamental political relationship to the United States").

F.   Judicial Perspectives.

At various points before 1950-1952 the Supreme Court considered Puerto Rico an

unincorporated territory of the United States.  See, Downes, 182 U.S. at 244 (1901); Balzac, 258

U.S. at 298 (1922); Shell, 302 U.S. at 261-262 (1937).  After Commonwealth was proclaimed in

---

[32] It is true that by way of the Supremacy Clause, federal statutes operate to preempt state constitutional provisions.  Yet states have voting representation in the Senate; their citizens have voting representation in the House; and citizens of states vote for the President of the United States.  In that regard, they participate directly in the process through which federal legislation is enacted. Residents of unincorporated territories like Puerto Rico have no such participation, for they have no voting representatives in Congress, nor the right to vote in Puerto Rico for President of the United States.  See, Igartúa v. United States, No. 08-1174 (D.P.R. June 3, 2009), aff'd 626 F.3d 592 (1st Cir. 2010), cert denied 132 S.Ct. 2376 (2012)("Since Puerto Rico is not a state … its citizens do not have a constitutional right to vote for members of the House of Representatives").  Id. at 594; Igartúa de la Rosa v. United States, 417 F.3d 145, 147 (1st Cir. 2005)(same as to presidential elections).  As the Second Circuit explained, United States "[c]itizens living in Puerto Rico, like all U.S. citizens living in U.S. territories, possess more limited voting rights than U.S. citizens living in a State. Puerto Rico does not elect voting representatives to the U.S. Congress . . .  In addition, citizens residing in Puerto Rico do not vote for the President and Vice President of the United States . . . the Constitution . . . confers to right to vote in presidential elections on electors designated by the States." Romeu, 265 F.3d at 123.  See also, Ballentine, 486 F.3d at 810-812 (same as to U.S. citizen/residents of the United States Virgin Islands).  Thus, territories are "ultimately governed by Congress," Verdugo-Urquidez, 494 U.S. at 268, without voting representatives in Congress elected by, and accountable to residents of the territories.  In Judge (now Justice) Ginsberg's words, "residents of territories lack equal access to channels of political power." Quiban v. Veterans Admin., 928 F.2d 1154, 1159 (D.C.Cir. 1991).  Parenthetically, the court notes that in Igartúa v. United States, No. 14-1588 (D.P.R. January 28, 2015), a sister court in this District recently rejected a claim that U.S. citizen-residents of Puerto Rico are entitled to vote for representatives from Puerto Rico to the U.S. House of Representatives, finding that (1) the arguments raised in the complaint were nearly identical to the ones raised in the prior case on the same issue, 626 F.3d at 592; (2) the text of the Constitution has not been amended; (3) Puerto Rico's political status has not changed; and (4) the relevant jurisprudence continues to be the same. Id. at pp. 1-2.  Plaintiffs appealed the dismissal.  The case is pending.  See, Igartúa v. Obama, USCA No. 15-1336.

1952, some courts stated that Puerto Rico is no longer a territory.  See, Salvador E. Casellas, *Commonwealth Status and the Federal Courts*, 80 Rev.Jur.U.P.R. 945, 952-955 (2011) and cases cited therein.  A purview of judicial developments, however, shows that such perspective has evolved to consider the character of the relationship between the United States and Puerto Rico as a function of congressional authority to legislate under the Territorial Clause.

In Califano v. Gautier-Torres, 435 U.S. 1 (1978), the Supreme Court held that Congress could constitutionally deny Supplemental Security Income benefits authorized for residents of the states and the District of Columbia, to persons who became residents of Puerto Rico.  Id.  In that regard, it has been pointed out that what makes the Califano argument – and result – possible is the *Insular Cases* doctrine that Puerto Rico belongs to but is not a part of the United States.  See, José J. Álvarez-González, *Derecho constitucional de Puerto Rico y relaciones constitucionales con los Estados Unidos: casos y materiales* 513 (2009)(so concluding after analyzing Califano). In Torres, 442 U.S. at 470, the Supreme Court relied fully on the theory of territorial incorporation articulated in the *Insular Cases,* noting that the Fourth Amendment does not automatically apply to Puerto Rico because it is an unincorporated territory rather than a State.  Id. at 469-471.  In Harris, the Supreme Court held that under the Territorial Clause, Congress may treat Puerto Rico differently from States so long as there is a rational basis for its actions.  For that reason, Congress can provide less assistance to Puerto Rico than to the States under the Aid to Families with Dependent Children program.  446 U.S. at 651.  In 1981 the First Circuit stated that:

> Puerto Rico's status changed from that of a mere territory to the unique status of Commonwealth.  And the federal government's relations with Puerto Rico changed from being bounded merely by the territorial clause, and the rights of the people of Puerto Rico as United States citizens, to being bounded by the United States and Puerto Rico Constitutions, Public Law 600, the Puerto Rico Federal

Relations Act and the rights of the people of Puerto Rico as United States citizens.

Córdova, 649 F.2d at 41.  The same year, it expressed that "Puerto Rico's territorial status ended, of course, in 1952."  First Federal Sav. and Loan Ass'n of Puerto Rico v. Ruiz de Jesús, 644 F.2d 910, 911 (1st Cir. 1981).  Neither Córdova nor Ruiz de Jesús mentions or refers to the Supreme Court's decisions in Califano, Torres, or Harris.  Moreover, in 1987 the First Circuit stated (albeit in *dictum*), that "in 1952, Puerto Rico ceased being a territory of the United States subject to the plenary powers of Congress." Quiñones, 758 F.2d at 40.[33]  That said, more recent decisions generally follow a different track.

To illustrate, in 1987, the First Circuit recognized that "Congress can, pursuant to the plenary powers conferred by the Territorial Clause, legislate as to Puerto Rico in a manner different from the rest of the United States." Rivera-Torres, 826 F.2d at 154 (internal citations omitted).  In 1998, a sister court in this District concluded that "[j]uridically speaking, Puerto Rico continues to be an unincorporated territory of the United States …"  Popular Democratic Party, 24 F.Supp.2d at 193.  In 2000, the First Circuit noted that Puerto Rico is a territory subject to Congressional power under the territorial clause, Dávila-Pérez, 202 F.3d at 468-469; in 2003 it described Puerto Rico as an unincorporated territory of the United States, Maysonet-Robles, 323 F.3d at 53; and in 2015 it pointed out that Puerto Rico is, "*constitutionally*, a territory." Franklin California Tax-Free Trust v. Commonwealth of Puerto Rico, 805 F.3d 322, 345 (1st Cir. 2015), cert. granted, 84 U.S.L.W. 3100 (U.S. August 31, 2015)(No. 15-255)(italics in original).[34]  Likewise, in 1993 the

---

[33] The Court in New Progressive Party v. Hernández-Colón, 779 F. Supp. 646, 661 n.20 (D.P.R. 1991), examined why the statement about Puerto Rico's status in Quiñones was *dictum*.

[34] In Franklin CA Tax-Free Trust, *certiorari* was sought and granted on the question "[w]hether Chapter 9 of the federal Bankruptcy Code, which does not apply to Puerto Rico, nonetheless preempts a Puerto Rico statute creating a mechanism for the Commonwealth's public utilities to restructure their debts."  See, Franklin CA Tax-Free Trust, No. 15-233 (U.S. December 4, 2015) (granting *certiorari*).  Additionally, in Pueblo v. Sánchez Valle, 192 D.P.R. 594, 644-645 (2015), cert. granted, 84 U.S.L.W. 3060

Eleventh Circuit concluded that Puerto Rico is still constitutionally a territory, United States v. Sánchez, 992 F.2d 1143, 1151 (11th Cir. 1993), on reconsideration, 3 F.3d 366 (11th Cir. 1993), cert denied, 510 U.S. 1110 (1994); and in 2001, the Second Circuit described Puerto Rico as "U.S. territory." Romeu, 265 F.3d at 122.[35]

G. United Nations

An argument has been made that Puerto Rico is not a territory because the United States represented to the United Nations that it is self-governing. Córdova, 649 F.2d at 41. Prior to the approval of the Puerto Rico Constitution, the United States had regularly transmitted to the Secretary General of the United Nations statistical and other information of a technical nature relating to economic, social and educational conditions in Puerto Rico pursuant to Article 73 of the U.N. Charter. Id.

Article 73 requires those reports from members who have assumed responsibilities "for the administration of territories whose people have not yet attained the full measure of "self-government." Shortly after approval of the Puerto Rico Constitution, the United States advised the U.N. that it would no longer report with respect to Puerto Rico because Puerto Rico was now a self-governing territory. Córdova, 649 F.2d at 41-42. As to the statement of the United States to the United Nations, the 2007 Report of the President's Task Force on Puerto Rico's status expresses the following:

---

(U.S. October 1, 2015)(No. 15-108), the Puerto Rico Supreme Court held that Puerto Rico is a territory rather than a sovereign entity in a case challenging a criminal conviction under the Double Jeopardy Clause. *Certiorari* was sought and granted by the Supreme Court on the question "[w]hether the Commonwealth of Puerto Rico and the Federal Government are separate sovereigns for purposes of the Double Jeopardy Clause of the United States Constitution." Id.

[35] As part of this progression, see also United States v. López Andino, 831 F.3d 1164 (1st Cir. 1987), cert. denied, 488 U.S. 1034 (1988) (Torruella, C.J. concurring)("Puerto Rico, notwithstanding PL 600, is still *constitutionally* a territory")(internal citations omitted)(italics in original). In the same way, the Eleventh Circuit held that "Congress may unilaterally repeal the Puerto Rican Constitution or the Puerto Rican Federal Relations Act and replace them with any rules or regulations of its choice." Sánchez, 992 F.2d at 1152-1153 (internal citations omitted).

> In its official request to the United Nations, the United States stated that Congress had given Puerto Rico the freedom to conduct its own internal government subject only to compliance with federal law and the U.S. Constitution. The official request did not state that Congress could make no changes in Puerto Rico's status without its consent. It is true that, prior to the submission of this official request, the U.S. representative to the U.N. General Assembly indicated orally that common consent would be needed to make changes in the relationship between Puerto Rico and the United States. **Notwithstanding this statement, however, the Department of Justice concluded in 1959 that Puerto Rico remained a territory**.

*Report by the President's Task Force on Puerto Rico's Status* 6 (2007) (emphasis added).[36] In the end, the court must find itself in agreement with the President's Task Force on Puerto Rico's Status, in that:

> "Commonwealth" is used to describe the substantial political autonomy enjoyed by Puerto Rico. The term appropriately captures Puerto Rico's special relationship with the United States. The Commonwealth system does not, however, describe a legal status different from Puerto Rico's constitutional status as a "territory" subject to Congress' plenary authority under the territory Clause "to dispose of and make all needful Rules and Regulations respecting the Territory … belonging to the United States." Id.

See also, Franklin, 805 F.3d at 337 (explaining that construction of preemptive effect of Congress' decision to exclude Puerto Rico from municipal relief provisions of Bankruptcy Code is consistent with congressional choice "pursuant to the plenary powers conferred by the Territorial Clause");[37] Pérez v. Crowley, 807 F.2d 1084, 1088 (1st Cir. 1986) (acknowledging Congress' power to delegate certain aspects of its maritime jurisdiction to Puerto Rico under the Territorial Clause).

---

[36] It is up to the political branches to evaluate and manage foreign policy aspects of this reality.

[37] For such purposes, a "municipality" is a "political subdivision or public agency or instrumentality of a State." 11 U.S.C. § 101(40).

United States v. Lebrón-Cáceres
Criminal No. 15-279 (PAD)
Opinion and Order
Page 34

H.   Present Statute

Whether and how a federal statute applies to Puerto Rico is a question of Congressional intent.  Antilles Cement Corp. v. Fortuño, 670 F.3d 310, 320 (1st Cir. 2012).  That is why Puerto Rico may be found to be included within one act whose coverage extends to states or territories, and excluded from another.  Id.  Thus, Congress explicitly defined Puerto Rico as a possession in Section 1301(29)(b) of the Federal Aviation Act of 1958, 49 U.S.C. § 1301, et seq. See, Popular Democratic Party, 24 Fed.Supp.2d at 193-194 (so noting); and excluded Puerto Rico from provisions allowing states to authorize municipalities to seek relief under Chapter 9 of the U.S. Bankruptcy Code, 11 U.S.C. §§ 101 (4), 101 (52), 109(c), Franklin, 805 F.3d at 325, 330-345 (describing and analyzing preemptive effect of enactment).  Even still, it is unclear what Congress affirmatively intended in amending Section 2423 but not Section 2422(a) as to inclusion of the term "commonwealth."

Puerto Rico is not mentioned in the Congressional session during which the amendment to section 2423(a) was initially proposed, or voted on.  So the term "commonwealth" mentioned in section 2423(a) could well refer to the 4 states whose official names include such designation rather than to Puerto Rico, namely, Kentucky, Massachusetts, Pennsylvania, and Virginia.  In that instance, there would be no doubt that the provisions at issue require a showing of interstate as opposed to intrastate travel to sustain a conviction in cases involving states.  The sister court in Mercado rejected this reading, characterizing it as futile.[38]

---

[38] The Mercado court reasoned that "[t]hose commonwealths have since been established as States of the Union and thus referring to them as commonwealths in the United States Code would serve no purpose." Id. at 15.  As noted above, however, interpreting "commonwealth" to include the Commonwealths of Kentucky, Massachusetts, Pennsylvania, and Virginia forecloses misunderstanding as to the need for an interstate link in case of States of the United States.

United States v. Lebrón-Cáceres
Criminal No. 15-279 (PAD)
Opinion and Order
Page 35

　　　　If names were considered dispositive in this context, Puerto Rico could be a territory within one section and a "commonwealth" within others, ensuring the full extent of federal prosecutorial power over the Island and all territories and possessions of the United States.  See, United States v. Beach, 324 U.S. 193, 195 (1945)(noting that in enacting the Mann Act, Congress intended all of the provisions which make the crime depend upon transportation in interstate or foreign commerce **to apply to the District of Columbia, the Territories and possessions of the United States without regard to the crossing of district, territorial or state lines**)(emphasis added).  See also, González Padín Co., 161 F.2d at 355 ("Congress can constitutionally regulate purely intra-territorial commerce"); Popular Democratic Party, 24 Fed.Supp.2d at 193-194 (pointing out intraterritorial application of the Federal Aviation Act of 1958 in Puerto Rico).  The court has not detected congressional intent to stay clear of intraterritorial enforcement here.

　　　　Section 2422(a) was not amended in 1998 (and has not been amended thereafter) to exclude Puerto Rico from the term "Territory."  Repeals by implication "are not favored."  Morton v. Mancari, 417 U.S. 535, 549 (1974)(quotation marks omitted).  The retention of the same term in the later laws suggests that no fundamental alteration was intended.  Kellogg Brown & Root Services, Inc. v. United States, ex rel. Carter, ---U.S.----, 135 S.Ct. 1970, 1977 (2015)(so recognizing).  Basic changes in the scope of a statute are not typically accomplished with subtle moves.  Id.  And so there is no reason why different sections of the statute at issue could not coexist.  See, Ruiz de Jesús, 644 F.2d at 912-913 (noting proposition in rejecting argument that post-1952 enactment to a section in a statute, implicitly removed Puerto Rico from the scope of another provision of national banking laws enacted prior to the commonwealth era in 1952).

### III.    CONCLUSION

With that in mind, the court finds that Congress did not intend to exclude Puerto Rico from the scope of Section 2242(a).  Rather, it left intact Puerto Rico's status as a territory of the United States.[39]  Section 2242(a) allows the government to prosecute cases in territories like Puerto Rico, even when the underlying conduct occurs solely within its borders.  The statute by its clear terms embraces the conduct alleged in the indictment.  On that basis, Lebrón's "Motion to Dismiss" (Docket No. 24) is DENIED.

**SO ORDERED.**

In San Juan, Puerto Rico, this 14th day of January 2016.

S/Pedro A. Delgado-Hernández
PEDRO A. DELGADO-HERNÁNDEZ
U.S. DISTRICT JUDGE

---

[39] The court expresses no view about the wisdom of Puerto Rico's current territorial status.